## Samuels v. Commonwealth.

(Decided September 23, 1913).

## Appeal from Todd Circuit Court.

1. Criminal Law—Continuance—When Should Be Granted.—The defendant is in every case entitled to reasonable time and opportunity to prepare his defense, and if the court fails, upon a proper showing, to allow a continuance for this purpose, it will be grounds for reversal.

2. Criminal Law—Continuance—Facts Stated.—A negro on December third killed another negro. On the next day he was indicted, and being unable to employ counsel, the court appointed attorneys to defend him, and set his case for trial on December 9th, when it was tried and his punishment fixed at death. From the time of the homicide until the trial the accused was confined in jail, and the attorneys employed to defend him were busy in court in other cases and had no opportunity to investigate or prepare his defense. Held reversible error to refuse a continuance.

W. B. REEVES, Jr., C. A. DENNY for appellant.

JAMES GARNETT, Attorney General; D. O. Myatt, Law Clerk, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, a negro, under an indictment charging him with the murder of Ben Covington, also a negro, was convicted and his punishment fixed at death. On this appeal we are asked in his behalf to reverse the judgment of conviction because the trial court erred in refusing to grant a continuance and in overruling the motion for a new trial asked upon the ground of newly discovered evidence.

Samuels and Covington were farm hands employed by Mr. Coleman, a farmer living some miles from Elkton, the county seat of Todd County. Samuels had been working for him six years and Covington four. The homicide occurred on Tuesday morning, December 3rd, between six and seven o'clock, and except for some words that passed between the deceased and Samuels on the Monday preceding that indicated there was some unfriendly feeling existing between them, there is no intimation in the record that they were not on good terms. They had both lived with and worked for the same man four years without having any open quarrel or difficulty, and yet the facts developed on the trial leave the impres-

sion that there must have been some bad feeling of a serious nature existing between these men.

The negro cook testifies that on Monday while the hands were eating dinner she passed by Samuels "and scratched him on the back of the head, and he says, 'Go way, cook; don't fool with me. I ain't fitten to fool with.' I says to him, 'What's the matter?' I says, 'Have I mistreated you?' and I never said nothing else to him. Directly Ben Covington says, 'Porter, have I mistreated you?' Porter never said anything except 'her name is Polly and your name is Ben Covington,' and that was all that was said, and Porter pushed his chair back and went to the water bucket, and then he came back by the stove and made a cigarette and never said anything to him, and Ben never said anything more to him in the kitchen."

This witness further testified that she kept a shotgun she had borrowed from Mr. Coleman's son, in the cabin occupied by her, which was a short distance from Mr. Coleman's house, and that she had eight loaded shells. That late Monday afternoon she saw the gun in her room, but when she returned to her room after supper the gun and three of the shells were missing, but she did not know who took either the gun or the shells.

Mr. Coleman relates the circumstances of the homicide as follows: "On Tuesday morning about 6:30 I went out to breakfast and I heard a noise in my back yard and I went out to see what it was. When I got there Polly Wilson, my cook, and Ben Covington were in a fuss. * * * Polly said that Ben had taken her gun out of the cabin last night and he won't tell me where it is, and Ben says, 'I didn't,' and Polly called him a liar, and I saw they were gettin pretty mad, and I took hold of her and gave her a little shove and told him to go in the house and dry this up, and as I shoved her toward the house I looked into the kitchen door and I saw Porter Samuels standing in the door, and I turned around and Ben was coming toward the kitchen, and he says, 'You called me a liar and I will whip you if it takes me a hundred years,' and I grabbed him by the arm and says, 'Come here Ben,' and I took him off to one side by the smokehouse and he says, 'Mr. Coleman, they accuse me of taking that gun out of the cabin last night and I didn't do it.' I says, 'Ben, there is something else behind all of this and I want you to tell me,' and by the time I got that out Porter Samuels had walked around the smokehouse and he come up and says to Ben, 'You know you

took that gun out of that cabin. You took it out of there to kill me with,' and Covington says, 'I didn't do anything of the kind. What do I want to kill you for?' Samuels says, 'Didn't we have some words yesterday,' and Ben says, 'Yes, but didn't I ask your pardon for it,' Samuels says, 'Yes, but I saw you last night and I saw you with your gun when you was tipping along by the well.' He says, 'No, I didn't.' He says, 'I have not got nothing against you. We have been here a long time together and I don't want any hard feelings.' They began to talk along and I didn't think either one was mad, and I stepped back a little, thinking it was all over, and heard a lick and then jumped in between them and shoved Porter Samuels back.''

He further testified that about that time he saw Ben going out of the yard gate and when he had walked a few steps he fell dead from the effects of a wound in his neck inflicted by Samuels with a butcher knife. Mr. Coleman further testified that the three missing cartridges were found in the pocket of Ben Covington and that after searching the premises for the gun they found it hidden in a cornshock a short distance from a road along which Porter Samuels would have passed on Tuesday in going to and from work, but there was no direct evidence that Covington took the gun from the cabin or hid it in the cornshock, although Porter Samuels in his own behalf testified that on Monday night he discovered the gun had been taken from the room of Polly Wilson and being apprehensive that Covington had taken it for the purpose of killing him, which he said Covington told him on Monday afternoon he intended to do, he was afraid to go to the cabin in which he slept, which was some distance from the house, and stay there all night, and asked Polly Wilson to permit him to stay in her house with a couple of other men who lived there, and that while he was in her house he looked out and saw Covington with the gun in his hand going in the direction of the cabin which he, Samuels, occupied. He further said that the next morning he was in the kitchen and heard the quarrel on the outside between Polly Wilson and Covington, and thinking that Covington might be going to attack him, he got a butcher knife from the table and put it in his pocket and went out for the purpose of telling Mr. Coleman that Covington had a gun after him the night before. He said that when he went to the place where Ben and Mr. Coleman were standing he said, ''Ben, you ought not

to tell Mr. Coleman you did not get that gun after me last night." And he said he did not, and I said, "Yes, you did," and he said, "It ain't too late for me to kill you yet," and he put his hand in or toward his pocket, and thinking that he had a pistol in his pocket and was going to kill me, I struck him with the knife one time.

Immediately after Samuels killed Covington Mr. Coleman took him to the jail of Todd County, where he was confined, and on the following day, Dec. 4, Circuit Court being in session, he was indicted and his trial set for December 9. The record shows that Samuels was unable to employ counsel, and on the day the indictment was returned the court appointed the attorneys who appear for appellant on this appeal to represent him. On December 9, when the case was called for trial, Samuels, through his counsel, filed an affidavit for a continuance, in which he set out;

"That he is not ready for trial at the present term of this court because the offense with which he is charged occurred in less than one week ago, and that he was indicted at the present term of this court and has not had an opportunity to employ counsel and to procure the attendance of all of his witnesses at this term of the court, and to make the necessary preparation for his trial:

"That he can prove by various witnesses, the names of all of whom he does not now know, but believes he can procure by the next term of this court, that Ben Covington, the decedent, bore the reputation in the community in which he lived of being a dangerous and violent man, and that he can also prove by various and sundry witnesses, the names of all of whom he does not know, that the said Ben Covington had threatened this affiant's life the day before the killing and at the time he made said threats was armed with a shotgun and watching and looking for this affiant for the purpose of killing him. This affiant states that if given an opportunity he can prove by various witnesses, the names of whom he does not now know, that affiant, at the time of the killing, and at all times prior thereto, bore the reputation in his community of being a peaceable, quiet and law-abiding citizen. He states that said testimony would be material in the trial of this case and that if this case is continued he can procure said testimony at the next term of this court."

And W. B. Reeves, one of the counsel appointed to defend him, also filed his affidavit, setting out that "said

appointment was made on the 4th day of December, 1912, and that since said time he and his co-counsel have been busily engaged in court most all the time and that they have not had an opportunity to investigate and prepare this defendant's defense, but that he believes if this case is continued to the next term of court they will be able to make and prepare a good defense for the defendant. That from what little investigation they had been able to make he believes that it can be proven by various parties that the negro, Ben Covington, who was killed, bore in his community the reputation of being a dangerous and violent man, and that they can prove on the night before the killing that he was armed with a shotgun and lay in wait, and that he threatened and intended to kill the defendant, Porter Samuels.

"He states that he believes they can prove, if given an opportunity, that the defendant, Porter Samuels, at all times bore a good reputation in the community in which he lived, and that he was a peaceful, law-abiding citizen. He states that with such little time for the preparation of this case for trial at this term of court, they cannot secure for the defendant a fair and impartial trial."

The court overruled the motion for a continuance, and on December 9 the trial was commenced and concluded and the verdict of the jury returned on that day, no witnesses appearing or testifying in behalf of appellant except two negro boys who lived on Mr. Coleman's place and whose evidence was not material. On the following day, December 10, a motion for a new trial was filed and overruled, and on the same day the judgment appealed from was rendered.

One of the grounds relied on for a new trial was the error of the court in refusing to grant a continuance and another was based on newly discovered evidence. Accompanying the motion for a new trial was the following affidavit of Mr. Coleman, a witness whose testimony has been referred to:

"The affiant, Thad Coleman, says that on Saturday, December 7, 1912, after a thorough search for the gun that was taken from the cabin of Polly Wilson, on his premises, on the 3rd day of December, 1912, he found same in a cornshock near the road about 20 yards from said road and about 300 yards from where they would have worked, along which the decedent, Ben Covington and Porter Samuels would have traveled in going to

their work on the 3rd day of December, 1912, and that said gun was hidden in said cornshock on the opposite side of said shock from the said road along which said parties would have gone in going to their work, and that the same was unloaded and was wrapped in the overcoat of Ben Covington. That affiant in detailing the facts and circumstances of said killing on the witness stand forgot and failed to mention the fact that said Covington's coat was wrapped around said gun when found, and that so far as he knows the defendant, Porter Samuels, nor his attorneys, knew of the fact that said overcoat was found with said gun, or that they had any opportunity to know said fact."

The record shows, as above stated, that within six days after the crime was committed the accused was tried, convicted and sentenced to be executed, and that during all this time he was confined in jail, and, as shown by the affidavits of the attorneys appointed to defend him, was without opportunity to consult or advise with his counsel, who, on account of other business, were unable to give his case any attention or make any preparation for his defense. Therefore, so far as preparing his case for trial was concerned, or having time or opportunity to do so, he might as well have been tried and convicted on the day the indictment was returned, as between that day and the day on which he was tried he was without means or opportunity to make any preparation whatever for his trial.

We might also add that there seems little use in appointing counsel to represent the accused, however capable they may be, unless they have a reasonable time to consult with their client, study the case and inquire into all the facts and circumstances surrounding it, and be thereby afforded a chance to be of some service to the prisoner whose rights they have undertaken by direction of the court to protect.

The affidavit of Mr. Coleman in support of the motion for a new trial forcibly illustrates the disadvantage under which appellant and his counsel labored in attempting to make any defense, as it is almost certain that this important piece of evidence would have been developed on the trial if the attorneys had been given reasonable time to investigate the case in all of its details. The fact that Covington's coat was wrapped around the shotgun when it was found in the cornshock, furnished practically conclusive evidence, taken in connection with

the cartridges found in his pocket, that he had taken the gun from the cabin of Polly Wilson and concealed it in this shock of corn, although he vigorously denied that he had taken the gun when accused of it by Polly Wilson and Porter Samuels. The circumstances in connection with the taking of the gun and the manner in which it was concealed and the place, which was near a road along which Samuels would pass the next day, also furnish persuasive evidence that Covington intended to do harm to Samuels on the following day. It is very true that the facts and circumstances relating to the gun, if developed on the trial, would not have justified the deed committed by Samuels or warranted the jury in acquitting him, but it is entirely probable that this evidence, in connection with the evidence of the violent and dangerous character of the deceased that it was avowed could be produced, might have influenced the jury to fix a lighter penalty than they did.

But however this may be, or whatever might have been the result of the trial if the evidence noted had been introduced, it seems manifest to us that the appellant was denied the right, to which he was entitled, to have a reasonable time and fair opportunity to prepare and present whatever defense he may have had. It is true the matter of granting a continuance in a criminal case is addressed to the sound discretion of the trial court, but this discretion does not authorize the court to refuse a continuance when the circumstances disclose, as in this case, a condition of affairs showing that justice to the accused entitled him to a postponement of his trial.

We recognize that it is important in the administration of the criminal law that a trial may be had as speedily after the transaction under investigation as a decent regard for the rights of the accused will permit, but it is more important that the trial should be fair than that it should be speedy. The peace and order of society demand that persons charged with crime should be brought to an early trial and if guilty, convicted and punished, but while this is so, the right of the accused to reasonable time and opportunity to prepare and present his defense and establish his innocence, if he can, should not be lost sight of, or the trial conducted in such haste as to deny the accused the right to be heard in his own behalf.

It was said in Penman v. Commonwealth, 141 Ky., 660, and may be repeated here, that ''Every person accused of crime, however guilty he may be, or whatever the nature of the crime charged against him, is entitled to a fair opportunity to prepare and present his defense. It is not the purpose of the law to deny any person accused of crime of the high privilege of establishing his innocence. And whenever it has appeared to this court that the accused was deprived of a reasonable opportunity to explain away his guilt, or was forced into trial without reasonable opportunity for preparation, we have not failed to grant a new trial. Because, however desirable in the interest of justice a speedy trial may be, it is of much greater importance that the law of the land should be administered in an orderly and deliberate way, so that every person arraigned for crime may have in truth a fair trial.''

It is true, as argued for the Commonwealth, that many applications for a continuance are made purely for the purpose of delay and with a view of defeating the ends of justice, but applications like this are generally made by defendants who have the aid of friends and money, and who hope by one of these methods to secure some undue advantage that could not otherwise be obtained. But when, as in this case, the defendant is a poor, ignorant and friendless negro, it is not to be suspected that the application for a postponement, under the circumstances stated, was made with the hope that it would result in any improper advantages or do more than enable him to present in his defense such facts and circumstances as might be procured through the assistance of his counsel from witnesses obtained by the ordinary processes of the law, which would have been placed at his disposal.

Being of the opinion that the record before us discloses facts that entitled the defendant to a postponement of his trial, we think the court committed error in overruling the motion for a continuance. Smith v. Commonwealth, 133 Ky., 532.

Wherefore, the judgment is reversed, with directions to grant appellant a new trial.