## McDaniel v. Commonwealth.

(Decided October 29, 1918.)

### Appeal from Warren Circuit Court.

1. Criminal Law—Continuance—When Reversible Error Not to Grant.—Every person accused of crime is entitled to a fair opportunity to present his defense, and unless this opportunity is accorded him, it will be reversible error to refuse a continuance.

2. Criminal Law—Continuance—Postponement for a Few Days.—It is not indispensable when a motion for continuance is made that the case should be continued until the next term of the court or for any certain time. A postponement for a few days may answer every purpose.

3. Criminal Law—Continuance—Grounds For.—Although the accused may have all his witnesses present and be unable to show that he could make out any better defense if a continuance was granted he should nevertheless have a continuance for sufficient length of time to enable his attorney to prepare the case.

4. Criminal Law—Continuance—Grounds For—Right to be Represented by Counsel.—It is provided in section 11 of the Constitution that: "In all criminal prosecutions the accused has a right to be heard by himself and counsel," and this right carries with it the right of his counsel to have reasonable time and opportunity to prepare for the trial of the case.

5. Criminal Law—Continuance—Time of Counsel for Preparation.—Where an accused charged with a capital offense was indicted in the morning and in the afternoon of the same day his case was called for trial and it appeared from the motion for a continuance that he had been only able to secure the services of an attorney a few hours before and on the same day the case was called for trial, a continuance should have been granted for a sufficient length of time to enable the attorney to familiarize himself with the case.

6. Criminal Law—Continuance—Right of Accused to Fair Trial in Form and Substance.—Every accused has the right under the Con-

stitution and laws of the state to a fair trial in form as well as substance and when this character of a trial has been denied a reversal will be ordered by this court if the facts appearing in the record warrant us in so ordering.

M. B. HARLIN for appellant.

CHARLES H. MORRIS, Attorney General, and HENRY F. TURNER, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

Under an indictment charging him with the murder of Dee Spears, Bradley McDaniel, a negro boy eighteen years of age, was convicted and his punishment fixed at death by the jury, and from the judgment on the verdict he prosecutes this appeal.

On Monday, April 22, Bradley McDaniel shot and killed Dee Spears, a white man, in the town of Smith's Grove, in Warren county. He was immediately arrested and conveyed to the jail of Warren county and there kept in confinement until the Thursday following, at which time he was, by an order of the Warren county court, taken to the jail of Jefferson county, in Louisville, in order to protect him from violence at the hands of a mob.

On April 30, 1918, the judge of the Warren circuit court, by a notice written and posted in the manner and form required by the statute, called a special term of the Warren circuit court to convene in Bowling Green on Tuesday, May 14. On Sunday night, May 12, McDaniel was brought from the jail in Louisville, Jefferson county, to the jail at Bowling Green, and there remained in custody until his trial. On Tuesday morning, May 14, the special term of the Warren circuit court was convened pursuant to the notice, and the grand jury, which was at once impaneled, returned, on the morning of May 14, the indictment against McDaniel under which he was tried. On the afternoon of the same day, when the case was called for trial, the attorney for McDaniel entered a motion to quash the indictment, which was overruled, and also filed a general demurrer to the indictment, which was also overruled, and then filed a motion, supported by written grounds, for a continuance of the case, which motion was also overruled. When these several motions had been overruled a jury was impaneled, and in the

early afternoon of May 14 the trial was commenced and concluded on the following day, when the jury returned the verdict heretofore set forth.

Before proceeding to state the grounds relied on for reversal it will be convenient here to make a brief statement of the facts. A few days before Dee Spears was shot and killed, his son, a boy about eleven years old, threw some potatoes or rocks at McDaniel while he was walking through the streets of Smith's Grove, and thereupon McDaniel slapped the boy several times, not, however, inflicting any injury upon him. McDaniel testified that on the following day, which was Saturday, he met the little boy on the street when the boy said to him that "his daddy was going to beat hell out of me." It further appears that McDaniel did not see or come in contact with Spears at any time after slapping the boy until Monday, when the killing occurred. On Monday morning McDaniel, after putting a pistol in his pocket, went to work for Lester Wright, who lived in Smith's Grove, and on the afternoon of this day Wright had occasion to go to the blacksmith shop conducted by Spears for the purpose of having some harrow teeth repaired. The harrow teeth were put in an automobile and Wright took McDaniel with him to the shop of Spears to carry the harrow teeth from the machine into the shop.

When the machine drove up in front of the shop, and ten or fifteen feet from the door, it was stopped and McDaniel carried into the shop a load of harrow teeth and upon asking Spears where to put them was told by Spears, who was busy at his anvil welding a piece of iron, to throw them on the floor; McDaniel then went back to the machine after another load of teeth and when he brought these in and had thrown them down on the floor Spears stopped his work at the anvil and said, according to the evidence of McDaniel: "Bradley, they tell me you have been beating up that boy of mine," and I says: "No, they threw some potatoes at me, and I slapped him," and he grabbed a piece of plank as I went out the door and threw it at me, and there was a wagon sitting down there and he grabbed a piece of 2x6 there, and I says: "Don't hurt me; I haven't done anything to you," and he says: "No, God damn you, I am going to break your neck," and he grabbed the 2x6 up and started onto me, and I shot him. Q. How many times? A. Five.

Q. How fast? A. As fast as I could. Q. How close was he when you fired? A. In about five feet of me; right close, but I didn't have the car door open, of course; if I had got the door open and got in there he would have struck me in spite of the world. Q. Were you running when he threw at you with the plank? A. Yes, sir, and it went into the car where Mr. Wright was sitting." Lester Wright was sitting in his machine and the only witness other than McDaniel who testified to what was said between McDaniel and Spears, said: "I had gotten in the car and was preparing to start the engine when Bradley came out the shop door, and as he was coming out of the door, or probably when he was on the steps, Spears called to him and asked him what he meant by jumping on his boy and beating him up, and he replied that he didn't jump on him and beat him up, but the boys were throwing potatoes at him and he slapped him, and Spears said: "You started this racket with the boy and I can prove it," and Bradley said: "No, Mr. Dee, I wasn't bothering anybody and I can prove it," and Spears called him a son-of-a-bitch and I started the engine and thought I would take him on away, and Spears laid down his hammer in the shop and throwed a chunk at him and it lit up in the car, and my next thought then was to stop the engine and get out of the way, and as I was stopping the engine I heard Bradley say: "Mr. Dee, don't do that," and in an instant he fired the shots. Q. Could you see Mr. Spears at the time the pistol was firing? A. I was stopping the engine at the time; the emergency brake wouldn't work, and the shots were fired while I was in the act of doing this. Q. In what position was Mr. Spears; whereabouts was he with reference to your car at that time; was he in the rear or in front? A. To the side of the car, towards the rear. Q. Where was the colored boy at the time the shots were fired? A. Standing at the side of the car near the front door. Q. How fast did that pistol fire from the time he began to shoot until he stopped? How long do you suppose it took for those five shots to be fired? A. As fast as they could be fired I imagine."

There seems to be no dispute about the fact that when McDaniel fired the shots he was standing close by the side of the machine nearest to the shop and that Spears was out in the street within a few feet of the

machine, or about the fact that Spears threw the piece of wood at McDaniel, or about the fact that as McDaniel was leaving the shop Spears followed him for a distance of twenty or twenty-five feet before the was shot; but there is no corroboration of McDaniel's statement that after Spears threw the piece of wood at him he picked up a piece of timber and was about to strike him when McDaniel shot.

Passing now to other matters, there appears no reversible error in the ruling of the trial court in reference to the indictment or the manner in which the jury was selected, and so we will turn to the motion and grounds for a continuance. The affidavit for continuance which was made by McDaniel is as follows:

"The defendant, Bradley McDaniel, comes and moves the court to continue this cause because he is not ready for trial at this time, for the reasons herein set out.

"He says that the killing of Dee Spears, with which this defendant is now charged, occurred in Smith's Grove on the 22nd day of April last, and that he was immediately arrested and brought to Bowling Green, Ky., and lodged in the Warren county jail, where he was held in custody until the Thursday following, April 25th, at which time he was, by an order of the Warren county court, taken by the jailer of Warren county to the jail of Jefferson county for safe keeping in order to protect him from violence at the hands of a mob. He says that he has been confined in said jail of Louisville, Ky., since said time, until the 12th day of May (last Sunday night about 7:30) when he was, pursuant to the order of the court, brought back to Warren county for trial.

"He says that on the day that he was carried to Louisville by the jailer of Warren county, and the sheriff thereof, there came to the city of Bowling Green a large body of men who lived in Warren county, and as affiant is informed at least 100 in number, for the purpose of doing this defendant violence; that they were armed, and were banded together for the purpose of securing this affiant by taking him by force from the officers, and taking his life.

"He says that they presented a petition to the county attorney of Warren county demanding that this defendant be placed upon trial immediately, and that unless he was tried by special term of this court, and was given

the death sentence that they would take the law into their own hands and see that he was executed; and he says that members of the said mob stated openly that the widow of the deceased Spears had told the members of the said band or mob when they left Smith's Grove, to 'bring that negro back with you and hang him in front of my window, so that I can witness his death.'

"He further says that said band of men composing said mob attempted to bribe the jailer of Warren county openly on the street, to give over the possession of the keys to the jail of Warren county, wherein this defendant was confined, in order that they might procure possession of his body; that on the same day and time, on the streets of the city of Bowling Green, they assaulted the jailer of Warren county, and the said jailer, in order to protect himself and enforce the law, was forced to draw a pistol in order to repel said assault and to prevent the said mob from accomplishing its purpose.

"He says that an account of the killing was published in the two daily and also the weekly papers published in the city of Bowling Green, Ky., as well as the action and conduct of said mob demanding the immediate trial of said prisoner, and gave the details of the whole matter; that the said papers have a wide circulation in Warren county, and that on account of the same the public mind is inflamed, and passion and prejudice has been aroused to such an extent that it will be impossible to get a jury at this time that will be wholly free from the influence of the feeling and prejudice against this defendant. He says that he is a colored boy, eighteen years old, and the deceased was a white man, who had resided in Smith's Grove for a long time; was well known, and had a number of kinspeople, and they now reside in this county, and that on account of his standing and prominence that he can not at this time obtain a fair trial of this cause.

"He says that he has been confined in the Jefferson county jail as set out above; that he has no means himself to employ counsel, and that there is no one who will do so for him except his father, and that his father is a poor man, and that only on this morning did he get arrangements made by which he employed an attorney in his behalf.

"He says that he has not since his arrest had any opportunity to make any investigation as to what he can prove or to ascertain the names of the witnesses that would be material to his defense.

"He states that owing to the feeling against him in the vicinity of Smith's Grove, and the antagonism to him and to his defense that he can not, without further time, ascertain the names of such witnesses and the statements that they will make.

"He states that on Friday before the said homicide that he was going along Main street, in the town of Smith's Grove, Ky., and that one of the deceased's sons threw rocks and rotten Irish potatoes at him, and that the same was repeated by the said son of deceased, and that he, this defendant, slapped the said boy, and that one Albert Franklin, who was with this defendant, was present and if he were here in court he would say:

" 'I was present on Friday evening before the killing and saw the son of deceased throwing rotten potatoes and stones at the defendant as defendant went along the street, and struck him with the same; that the defendant had done nothing to the said Spears' boy, whatever.'

"He says that he can also prove by a man living in Edmonson county that he saw this shooting and that as the deceased came out of the door of his shop that he picked up a piece of timber and threw it at the defendant and was following him, and that he then saw the said Spear pick up another piece of timber and run towards the defendant with the same drawn to strike him, and just at that time the defendant shot him.

"He says that this man is a resident of Edmonson county and he has just learned of this fact today; that his informant does not know his name but he can be had, and that he is informed that he can obtain his presence at the court to testify if given time to investigate and learn his name.. These above statements will be true as he believes."

"It also appears from the record that when this affidavit was filed the attorneys for the Commonwealth filed the following affidavit of Morton McDaniel, the ignorant old father of Bradley McDaniel:

" 'That affiant, Morton McDaniel, states that he is the father of Bradley McDaniel, the defendant herein, and

that he informed Max B. Harlin, the attorney of said Bradley McDaniel, of the facts stated in the affidavit filed for a continuance of this case on the 14th day of May, 1918, and that he had learned that the man's name referred to in the affidavit as being a citizen of Edmonson county, was John Cayton, and that said Cayton is now present in court ready to testify in said case. That at the time he gave the information to Mr. Harlin he did not know the name of the man but has since found out his name, which was written in a book and furnished to this affiant, and says that said witness' name is John Cayton.' ''

"In the motion and grounds for a new trial it was set out that: "Third. The court erred in overruling the defendant's motion for a continuance in this cause, for the reason set out in his motion and grounds which were filed at the time, and are made a part of the record, asking the court to continue this cause. That he had had no opportunity to prepare his defense; that he had been given no opportunity to consult his attorney; that he had been confined in the Jefferson county jail away from his friends, and had not even had an opportunity to see his father or mother until the morning of the trial. He says that his father and mother are old and illiterate, and were unable to make an investigation concerning the case, while he was away in the Jefferson county jail, and that he had no one in Warren county who could or would make an investigation for him, or make any preparation for the trial of his case in his behalf. That no attorney had been employed for him, and none was employed until the morning of the trial, and that his attorney had no opportunity to make any investigation or preparation whatever.

"Fourth: He says that the court erred in permitting the sheriff, over the objection of the defendant, after the regular panel had been exhausted, to summon bystanders from the court room to compose said jury; that six of the said jury were composed of such bystanders; that the sheriff called the same from out of the crowd then and there present; that the court room was crowded to the utmost with white men who were ardent sympathizers against this defendant, and that said crowd was largely made up of the same men who had previously come to Bowling Green for the purpose of taking this

defendant from the jailer of Warren county and murdering him. To all of which defendant objected and the court overruled his objections, and to which ruling he excepted and still excepts.

"He says that the said men who composed the said mob were in constant attendance at said trial in said court room, and that during the whole of said trial the court room was filled to overflowing with men who desired that this defendant be convicted and executed, and were waiting and ready to attempt to carry out the threats which they had made only a few days before; that is, if the jury did not give this defendant the limit they would do so. That by such a condition the jury was influenced and prejudiced against him, and intimidated, as well, into convicting him and fixing his punishment at death.

"Fifth. He says that the verdict is not sustained by the evidence, but that it is the result of passion and prejudice on the part of the jury, and that as an evidence of that fact the said jury only remained out of the court room for a very short time considering the case. (Something less than twenty minutes.)

. . . . . . . . . . . .

"Eighth. The verdict is not supported by the law and evidence, and was reached through passion, bias and prejudice, and was also the result of fear and intimidation by the said jury from said mob."

The ground for a new trial which was verified by the affidavit of McDaniel was also supported by the affidavit of his attorney, who said: "Affiant, Max B. Harlin, says that he is defendant's attorney and that he represented defendant on the trial in this cause and that the foregoing statements are true as he believes."

In response to the motion and grounds for a new trial the attorney for the Commonwealth filed an affidavit in which it was set out that the six jurors who were drawn from the wheel, except one who lived eight miles from Smith's Grove, resided from fifteen to twenty-two miles from that place, and that of the six bystanders who were selected on the jury, none of them resided less than twelve miles from Smith's Grove, the residence of the others being from fifteen to twenty-five miles from that place.

After a careful consideration of this record and the aid of oral argument as well as briefs by attorneys representing the Commonwealth and the accused, we have reached the conclusion that the judgment appealed from should be reversed and the defendant granted a new trial, and this, upon the sole ground that his motion for a continuance should have been sustained. We do not mean, however, to say that the case should have been continued until a subsequent term of the court or for any particular length of time, but that it was prejudicial error under all the facts and circumstances appearing in the record to compel the defendant to go into trial for a capital offense on the day the indictment was returned against him and within a few hours thereafter. In order that the ground of our decision may be clearly understood, a brief *resume* of the material and uncontradicted facts appearing in the record will be helpful. (1) On April 22, the defendant committed the crime for which he was tried and convicted and within a few hours thereafter was lodged in the Warren county jail, from which place he was carried to the jail of Jefferson county three days afterwards to protect him from a mob that on the day of his removal to Jefferson county came to Bowling Green for the purpose of taking the defendant by force from the jail and lynching him.

(2) That this mob, composed of at least one hundred men, presented a petition to the county attorney of Warren county demanding that the defendant be placed upon his trial immediately at a special term of the court and unless he "was given the death sentence they would take the law into their own hands and see that he was executed." That in pursuance of their purpose the mob, after failing in their attempt to bribe the jailer to surrender to them the defendant, assaulted him, and the jailer, "in order to protect himself and enforce the law was forced to draw a pistol in order to repel the assault and prevent the mob from accomplishing their purpose."

(3) A special term of the court for the trial of this case was called to meet on Tuesday morning, May 14, and on the Sunday night preceding this date the defendant was, by an order of the court, returned to the Warren county jail for trial.

(4)   On the morning of Tuesday, May 14, a grand jury was impaneled and before noon of the same day the indictment was returned, and the case set down for trial in the early afternoon of the same day, at which time the motion and grounds for a continuance was filed. The defendant had never consulted with or had opportunity to consult with any attorney until the morning of the day the case was set for trial, nor had any attorney been employed to represent him until this time.

(5)   The defendant was a negro boy, apparently without friends, or at least without friends who had the means or ability to assist him financially or otherwise, and the only relative who took any interest in his behalf and finally secured an attorney for him was his old and poor father.

(6)   The man he killed was a well known and highly respected citizen of Warren county, who had a large relationship in the county.

The foregoing facts appear in the motion and grounds for a continuance, but we also think it proper to insert in this connection that in the motion and grounds for a new trial it was stated that when the case was called for trial "the court room was crowded to the utmost with white men who were ardent sympathizers against this defendant and that said crowd was largely made up of the same men who had previously come to Bowling Green for the purpose of taking this defendant from the jailer of Warren county and murdering him." It further appears that six of the jurors who tried the defendant were taken from the crowd in the court room, over the objection of counsel for the defendant, who requested that the whole jury be drawn from the wheel.

In answer to the argument that a continuance should have been granted it is urged in behalf of the Commonwealth that the affidavit for a continuance did not disclose the absence of any witnesses except the Edmonson county witness, Cayton, who was present at the trial, but not introduced; or that the defendant, if a continuance had been granted, could have made out for himself any better defense than he did on the trial, and it is called to our attention that in the case of Penman v. Commonwealth, 141 Ky. 660, this court said: "Under circumstances like those existing in this case, the sole

purpose of granting a continuance would be to give the accused an opportunity to present some evidence in his behalf that he could not obtain or introduce if required to try at the term the motion for a continuance was made, or to enable him to employ and advise with counsel needed in his defense whose employment or advice he could not secure unless a continuance was granted, or to give him an opportunity to discredit, impeach or contradict the testimony that might be offered for the prosecution. Accepting these propositions as a test of appellant's right to a continuance, he failed in every particular to show that if a continuance had been granted he could have improved his situation." It further appears, however, from the opinion in that case that the indictment against Penman was found on September 28, and his trial was not commenced until September 30, and his attorneys were employed on September 29, nor did it appear from the affidavit for a continuance in that case that Penman, who was notified on September 15, that his case would be called for trial on September 28, was not able to employ attorneys between those dates. And so we are well satisfied that the Penman case is not controlling authority in this case.

The Constitution of the state, in section 11, declares in part that "in all criminal prosecutions the accused has the right to be heard by himself and counsel," and nobody will dispute that under our form of government the right of the accused in every case to be heard by himself and counsel is, as provided in section 1 of the Constitution, an "inherent and inalienable right," that no defendant, whatever the crime charged against him or however incensed the public may be on account of its commission, should be denied. Its denial would be destructive of the majesty of the law and create in the minds of good citizens and right-thinking people a fear that courts were not courageous or powerful enough to protect from mob violence persons charged with crime, when everybody ought to feel and know that courts are both courageous and powerful enough when their courage and power is put to the test, to withstand the demand of inflamed and angry citizens for the life of an accused, and to give him that trial in form as well as substance which every citizen is entitled to in a court of justice.

People generally have respect for courts, they appreciate the fact that they are an indispensable part of the machinery of government, and that without them there could be no security for life or protection for property, and that the peaceful and order loving would be helpless in the presence of the lawless element that is everywhere to be found. It is also true that good people believe, and have the right to believe, that the courts having, as they do, the whole power of the Commonwealth behind them, can and will in decency and order dispense justice without fear or favor, giving to each, whether he be weak or strong, humble or great, guilty or innocent, a trial according to law; and while there are times when some shocking and brutal crime stirs the blood of the best of men and makes them feel that quick retribution should follow, yet we cannot but think that when the time for reflection comes, as it always does, they would be better satisfied if the course of justice was marked by the dignity and deliberation that so well becomes tribunals that are clothed with the authority of the law and represent its majesty and its power. Anything that encourages a feeling that the courts are not strong enough to protect any person who is committed to their custody naturally weakens their influence and makes thoughtful people doubtful of their ability to stand firm in the face of popular applause or popular indignation.

So that, notwithstanding the clamor for speedy trials, we believe that trials may be too speedy, and thus do more harm than good to the body politic by lessening in place of increasing respect for law.

We further think that the constitutional right of the accused to be represented by counsel necessarily carries with it the right of his counsel to have reasonable time and opportunity to get his bearings, to look over the ground, and to study the case in its various aspects, so that when he goes into the trial he may be prepared to give to his client the full measure of his experience and ability in the conduct of cases, and especially is some reasonable time for study and preparation required of an attorney who assumes the burden of representing an accused who is charged with a capital offense and whose life may be the penalty of any mistake or want of information on the part of his counsel. An attorney is never

called on to perform a more serious or solemn or difficult duty than when he undertakes to defend an accused who is charged with a capital crime, and we venture the assertion, drawn from experience as well as observation, that no attorney, however capable or experienced he may be, can go into the trial of a capital case within a few hours after he has been first employed and give to that case the skill and ability the accused is entitled to have at his hands.

It is true McDaniel had employed counsel to defend him, and it does not appear that any witness whose evidence he desired was absent from the trial, but as said in Allen v. Commonwealth, 168 Ky. 325, "The mere presence of witnesses and the services of counsel are only a part of the preparation needed in important cases. The accused may, in some cases, have every witness that he needed in the court house and be represented by able counsel and yet not have the time for preparation that he should be allowed in order to properly present his defense."

It was further said in that case: "There is a just and widespread sentiment throughout the state against unreasonable delay in the trial of criminal cases, and this feeling has sometimes caused trials, especially in cases attracting more than ordinary interest, to be pressed with more dispatch than is becoming in the orderly administration of justice or than is consistent with the right to a fair trial in form as well as substance that every accused person should have.

"We appreciate fully the importance as well as the necessity for a prompt hearing and disposal of criminal cases, and in no case have we hindered the early enforcement of the law by ordering a new trial because a continuance was not granted, unless it clearly appeared that the substantial rights of the accused were prejudiced by the ruling. But the speedy trial to which both the accused and the Commonwealth are entitled does not mean that either shall be so hurried as not to afford a full and fair opportunity to each to prepare the case.

"It is not, of course, indispensable when a motion for a continuance is made that the case should be continued until the next term of the court, or for any certain time. All that is required is that the accused and his counsel shall have such time as the nature of the

case and the circumstances surrounding it appear to be necessary to enable them to prepare for trial.''

It was further said in that case that ''this court has in many cases emphasized its purpose not to permit technical errors to interfere with the execution of judgment rendered after a fair trial, and has time and again said that it would not reverse cases unless it appeared that the substantial rights of the accused were prejudiced by some ruling of the trial court. But we have also condemned, in equally emphatic terms, the disposition, sometimes brought to our attention of trial courts to hurry the accused into the trial of a capital case without giving him reasonable time for preparation.''.

In addition to what has been said and in order that the trial courts in the state may have again brought to their attention the importance of allowing reasonable time for preparation, and as further illustrating the purpose of this court so far as lies in its power not to obstruct the speedy administration of justice on the one hand, or on the other refuse a new trial when it appears that the accused did not have that character of trial guaranteed by the Constitution and laws of the state, which reflect the sober judgment of its people, we may here repeat what was said in Penman v. Commonwealth, 141 Ky. 660:

''Every person accused of crime, however guilty he may be, or whatever the nature of the crime charged against him, is entitled to a fair opportunity to prepare and present his defense. It is not the purpose of the law to deny any person accused of crime of the high privilege of establishing his innocence. And whenever it has appeared to this court that the accused was deprived of a reasonable opportunity to explain away his guilt, or was forced into trial without reasonable opportunity for preparation, we have not failed to grant a new trial. Because, however desirable in the interest of justice a speedy trial may be, it is of much greater importance that the law of the land should be administered in an orderly and deliberate way, so that every person arraigned for crime may have in truth a fair trial.''

And also what was said in Samuels v. Commonwealth, 154 Ky. 758: ''We recognize that it is important in the administration of the criminal law that a trial may be had as speedily after the transaction under investigation as a decent regard for the rights of the accused will

permit, but it is more important that the trial should be fair than that it should be speedy. The peace and order of society demand that persons charged with crime should be brought to an early trial and, if guilty, convicted and punished, but while this is so, the right of the accused to reasonable time and opportunity to prepare and present his defense and establish his innocence, if he can, should not be lost sight of, or the trial conducted in such haste as to deny the accused the right to be heard in his own behalf."

It may unfortunately be true that in some cases that come to this court we are obliged to affirm the judgment appealed from although with a feeling that the accused did not have a fair trial in form and substance, but the failure to order a new trial in such cases was only because no reversible error appeared on the record, and this being true, we did not have power or jurisdiction to do so.

On another trial of the case we think the court should sustain an objection to the question of the attorney for the Commonwealth, if asked, as to the incarceration of McDaniel in the House of Reform.

For the error in refusing to grant a continuance, the judgment is reversed with directions for a new trial.

The whole court sitting except Chief Justice Settle, who is absent.