## Hunt v. Commonwealth.

(Decided May 31, 1938.)

C. L. TARTER and W. R. JONES for appellant.

HUBERT MEREDITH, Attorney General, and GUY H. HERD-MAN, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE BAIRD—Affirming.

Gifford Hunt was tried and convicted for the killing of Joe Stringer in the Pulaski circuit court on the 1st day of October, 1937, and his punishment fixed by a jury at confinement in the penitentiary for life. From the judgment based upon that verdict he appeals.

He rests his right of reversal on the following grounds: (1) That the verdict of the jury was flagrantly against the evidence; (2) that the court erred in the admission of incompetent testimony and in refusing to admit competent testimony offered by him; (3) that the verdict returned showed prejudice against appellant; and (4) that the court erred to the prejudice of appellant in refusing a continuance to another day in the term in order to allow his counsel time to prepare his defense.

A discussion of the first alleged error necessitates a resumé of the material evidence developed in the case. Joe Stringer, the deceased, a young man about 21 years of age, lived in or near Somerset, Pulaski County, Kentucky, in a locality known as "Frog Level." On Sunday, September 19, 1937, somewhere near 4 o'clock of that day, he left his home in company with a girl living in the same neighborhood by the name of Leeta Turner, in his automobile. They went from his home, together with Ira Jones, a young man of the same neighborhood, to Gregory's restaurant in Somerset and bought some cigarettes. They stayed there a few minutes, then motored back to "Frog·

Level," where they started from. There they "picked up" a girl by the name of Bee Prather. They then came back to Buck Gossett's restaurant and stayed there a while; then drove out Highway No. 80, east of the city, about six miles, for the purpose of seeing Joe Stringer's boss, who was at the time with a company of men working on the highway. On the way they stopped at several stores or roadhouses. Ira Jones purchased about a pint and a half of liquor. They all drank except Leeta Turner, who claimed that she did not drink. They came in contact with one Gabe Smith, and the defendant, Hunt. They were all riding in Stringer's automobile, making at that time a company of six. There is some dispute in the testimony as to whether Hunt entered the automobile by invitation or whether of his own accord and against the consent of Joe Stringer, owner of the automobile. In any event, Hunt got into the automobile, and when he did so, he said he borrowed $5.00 from Andy Bales. Some of the number purchased more whiskey as they traveled along the highway at a roadhouse, and while none of them claimed to be drunk, still all were drinking except Leeta Turner. On their way to Somerset, somewhere along the highway, appellant, Hunt, who was sitting by the driver, Ira Jones, leaned against the automobile door and fell out. In falling, a pistol was exhibited in a holster upon his person and it fell out upon the ground. Hunt made threats against those riding in the automobile and said that he would shoot all of them. Ira Jones took the pistol from him and placed it under his feet next to the door on the side he was sitting in operating the automobile. They then drove on, all considerably under the influence of liquor, but friendly, and showing no evidence of trouble until they reached Somerset, just in front of the Christian Church in that city, where the trouble occurred which ended in the death of Joe Stringer. The only witnesses to the killing were Leeta Turner, Virgil Bobbitt, Mrs. Virgil Bobbitt, Gertrude Spradlin and Dessie Cox. After reaching the city in front of the church, Bee Prather, Ira Jones and Gabe Smith left the automobile and went away, leaving Hunt and Stringer in the automobile. Leeta Turner had gotten out, but had not gone far away.

Leeta Turner described the killing of Stringer in the following manner:

"* * * Q. Go ahead, and tell what else occurred? A. Ira Jones took the gun away from him and put it down under his feet, and this fellow kept trying to get it, then when we got down here to the top of the hill, he said to give him the gun and he'd knock him in the head, and Ira gave him the gun; it was laying there in the floor.

"* * * Q. Go ahead, what else occurred? A. We got up there and he got out of the car, and Ira Jones started to get in a taxi, and Hunt made a grab at Joe's throat with both hands; they was in the car and I was out of the car.

"* * * Q. At that time, who had the pistol? A. Hunt had it.

"Q. When had he gotten it? A. Jack Jones give it to him just before that.

"Q. Go ahead. A. Joe had one foot out of the car and one on the fender, he was trying to keep this fellow from shooting him; I was scared, Jones was getting in the taxi, and I got hold of Hunt by his belt, and I went in behind the car, and Hunt just grabbed around Joe and commenced cutting him.

"Q. Where were Joe Stringer's arms at that time? A. They were down at his side.

"Q. Where were you with reference to Joe Stringer? A. I was right back of the car.

"Q. Was Joe Stringer doing Hunt any harm or offering to injure him or hurt him in any way? A. No, sir, he was not.

"Q. Did Hunt have hold of Stringer? A. Yes, sir.

"Q. How did you know he was cutting Stringer? A. Joe said he was.

"Q. In what manner was Hunt holding him? A. He just had his arms around him, with Joe's hands down like this (illustrating) cutting him.

"Q. Do you mean he was reaching around Stringer cutting him? A. Yes, sir.

"Q. While this cutting was going on, did you hear Hunt say anything? A. No, sir.

"Q. Did you hear Stringer say anything? A. No, sir.

"Q. What else occurred? A. I tried to pull Joe away, but he pulled him loose, and then he let Joe loose and he fell, and I saw this fellow do like this (illustrating).

"Q. Did you see a knife in Hunt's hand? A. I never saw the knife at all.

"Q. Was there anybody else mixed up in that fight except Joe Stringer and Gifford Hunt? A. No, sir.

"Q. They were all that was engaged in the fight? A. Yes, sir.

"Q. You say that you saw Stringer fall? A. Yes, sir.

"Q. When Joe Stringer fell, where was Hunt? A. He was standing right there over him.

"Q. What, if anything did he do? A. When Joe fell, this fellow reached down like this (illustrating).

"Q. How far down did that lick go? A. Just about to the ground, it looked to me like.

"Q. When Stringer fell, what position did he fall in? A. On his back, I think; I don't know.

"Q. When Hunt came down with that blow as you have indicated to the jury after Stringer was down on the ground, at that time, did you see the knife in Hunt's hand? A. No, I didn't see the knife.

"Q. When Hunt was cutting Joe Stringer there, state to the jury whether Stringer was offering to do Hunt any harm. A. No, sir, he was not.

"Q. You say Joe Stringer told you that Hunt was cutting him? A. Yes, sir.

"Q. After Stringer told you Hunt was cutting him, did he ever say anything else? A. No, sir.

"Q. Did Hunt say anything? A. No, sir.

"Q. After Stringer fell, and this lick was struck that you have told about, was there any more fighting after that? A. No, sir.

"Q. At that time, what had become of Ira Jones and Bee Prather? A. They'd done got in the taxi and gone.

"Q. Then what did Hunt do? A. He run off.

"Q. What did you do? A. I got Joe's head up in my lap, and was calling his name.

"Q. You say Hunt ran off, which way did he run? A. He run in back of the church.

"Q. This occurred down here on Main street? A. Yes, sir.

"Q. In front of the Christian church? A. Yes, sir.

"Q. When Hunt ran away, he ran in behind the Christian Church? A. Yes, sir.

"Q. That only left you and Joe Stringer there? A. Yes, sir.

"Q. Did Hunt say anything as he was leaving? A. No, sir.

"Q. He said nothing before he left? A. No, sir."

Virgil Bobbitt, who lived just across the street from the church and at the time was sitting in a chair on his porch, said that he heard Leeta Turner "holler" and that attracted his attention. He described the killing as follows:

"* * * Q. Then what did you see next? A. The next thing I saw was Stringer running from Hunt, of course I didn't know who Hunt was at that time; and as they run, Stringer was holding his side, and running side-ways.

"Q. Go ahead. A. Then Hunt tripped Stringer, and the Stringer boy fell with his head sideways like by the curb, and when he went over, Hunt bent down over him, this way (illustrating), and then Hunt grabbed hold of Stringer's head and jerked his head up and down against the street a couple of times, and then the Stringer boy shut his eyes, and Hunt stabbed him three times just as fast as he could, and the last time he stabbed him, the blood flew that high (illustrating), and he never breathed again.

"Q. You say Hunt stabbed Stringer three times? A. He did.

"Q. What position was Stringer in when Hunt stabbed him those three times? A. His face was up this way (illustrating), he was on his back.

"Q. What position was Hunt in? A. He was up over him, stooped over."

Mrs. Virgil Bobbitt, who was sitting in a swing in the yard near her husband, made the same testimony in substance as that of her husband, Virgil Bobbitt. Gertrude Spradlin was also attracted by the trouble in front of the church; she was sitting on the porch at the time with Mr. Bobbitt; but all she saw were the parties engaged in the trouble "scrambling around," as she said; she turned her head to keep from seeing it. Dessie Cox, who lived below the Kenwick Hotel on the opposite side of the street from Virgil Bobbitt, gave her description of the killing as follows:

"* * * Q. I wish you would tell the jury just what you saw? A. I had just come out from supper. I came through the hall out on the porch; I hadn't been there any time hardly when a car drove up and stopped right in the middle of the street; I know it was in the middle of the street because other cars coming along had to stop behind them, or pull clear over against the sidewalk to get by; this car stopped, and these people in the car were arguing or quarreling or it sounded that way to me.

"* * * Q. Tell the jury what was said? A. Well, I heard some one say 'you take the wheel, Jack, he's got his gun and is going to shoot;' that's all I heard right then, and then the car door opened, and somebody got out.

"* * * Q. What did these parties who had gotten out do? A. They walked on up to where the car was, the girls did.

"Q. Then what occurred? A. The car door opened, and three men got out.

"Q. Then what occurred? A. Two of them got in a taxi, and that left two there, two men.

"Q. Did you later learn that the two left were Stringer and Hunt? A. That's who it was, yes.

"Q. What did you see them do? A. They scuffled and fought.

"Q. Did you see some licks pass? A. Yes, sir.

"Q. Go ahead. A. Well, this man finally got Stringer down, one of them got the other one down, and the other man made a lick at the man that was down.

"* * * Q. This man at that time was on the ground? A. Yes, sir.

"Q. While he was on the ground, how many licks did you see the other man make? A. Three or four.

"Q. Did you hear anything the man on the ground said? A. No, sir.

"* * * Q. Were those licks struck hard, or not? A. Pretty hard, yes.

"Q. Then what became of the man that was striking the licks? A. He run.

"Q. Was he running fast or slow? A. Fast.

"Q. Where did he run? A. Down the alley by the church.

"Q. In what way was Hunt holding Stringer when he was cutting him? A. It looked to me like he was holding him with his knees.

"Q. Before this man got down, how were they holding each other? A. They was knocking each other around; one man was holding and the other one was trying to get loose.

"Q. You saw Stringer fall? A. Yes, sir.

"Q. Do you know what caused him to fall? A. He was knocked down, it looked to me like.

"Q. Could you tell what Hunt was striking Stringer with? A. No, I really thought he was hitting him with his fist."

This, in substance, is the testimony on the part of the commonwealth pertaining directly to the killing.

The defendant, Hunt, admitted that he killed Stringer, but in doing so he said that he acted in his own self defense. His testimony as to what occurred between himself and Stringer is in substance as follows: He stated that he was at the time about 41 years

of age; that on the day that Stringer was killed, which was in the evening of the 19th of September, he was at the store of Andy Bales at the Shopville Post Office; that about 4 o'clock of that day, Joe Stringer, Leeta Turner, Bee Prather and Ira Jones, who were riding in an automobile, stopped at the store where he was; that at that time he did not know either of them; that he had never seen them before; that Stringer got out of the automobile and came to him and made inquiry as to where he could secure some whiskey and at the same time asked him if he had any money; that he told him he did not. About that time Gabe Smith who lived near the post office came up; that Stringer then told him and Smith that if they had some money, they would go back to Somerset and get two more women and have a big time. Smith then went to his cabin and changed his clothes and came back to the automobile and he and Smith got into the automobile without any objection on the part of Stringer. He stated that Stringer invited him to go; that he sat upon the front seat with Ira Jones, the driver of the automobile. There was then in the automobile the two girls and Ira Jones, himself, Joe Stringer and Gabe Smith. They then motored toward Somerset. On the way at a roadhouse known as the "Peggy Anne" they obtained a pint of whiskey. He obtained the money to buy the whiskey from Smith. All of them drank it; that he had a pistol upon himself at the time, but no one knew it until they reached a filling station. At that point the door of the automobile was not fully closed. He leaned against it and it flew open and he fell out. When he did so, his pistol fell out and those in the automobile saw it. He had it in a holster on his left side. Ira Jones then said let him have the pistol and Jones reached and jerked it out of the holster and then laid it on the seat on the other side of him by the door. The other four were in the back seat. Just as they reached Somerset, Jones stopped the automobile on what was known as South Main Street. Then Jones left the automobile and started toward Somerset walking. He, Hunt, then obtained the pistol and put it back in the holster. Jones came back to the automobile and started it, but, after moving a short distance, stopped the automobile and did that once or twice. At that time, he, the defendant, had his pistol in his holster. When the automobile stopped, Ira Jones grabbed him and a girl just

behind him took his gun off of him and took out of his left front pocket $10.00; that they then beat him with their fists or some blunt instrument, he did not know what it was. Then Jones drove the automobile in front of the church and the home of Virgil Bobbitt. Jones, the girls and Smith left the automobile before Hunt got out. At that time Joe Stringer had his, Hunt's, pistol. He asked Stringer for it several times. Stringer gave it to him, but later on he stated that Stringer refused to give it to him and when he asked for it, he said that Stringer struck him over the head with it; that when he did so, he, Hunt, threw up his arm to keep Stringer from striking him again on the head; that Stringer followed after him with the pistol pointed at him; that he then got his knife and started cutting Stringer; that he did so to keep Stringer from killing him; that Stringer did not shoot, although his pistol was loaded; that after he cut Stringer and he fell to the ground, he, Hunt, picked up his pistol, put it in his holster on his person and put his knife into his pocket and left, but he did not know where he went; that he did not know what became of the knife; that he was afterwards arrested by the officers of the city and placed in jail. Mrs. George Adkins, the wife of the jailer, stated that the following morning after he was put in jail, she saw a knot on his head through the door screen, but did not know when he received it or the extent of the injury.

This in substance was the testimony of the defendant. There were a number of other witnesses introduced by both plaintiff and defendant attacking the general reputation of some of the witnesses, and especially that of Leeta Turner and Bee Prather, as to their general moral reputation, and stated that their reputations were not good.

The jury were the sole judges of the credibility of the witnesses. If the testimony of the witnesses, Leeta Turner, Virgil Bobbitt, Mrs. Virgil Bobbitt and Dessie Cox, was worthy of belief, then the verdict of the jury was abundantly authorized by the proof. We see no necessity for the court taking the time to analyze the evidence. A mere detail of the substance of it is sufficient to satisfy any reasonable person that the verdict was not flagrantly against the evidence. Such a contention is not well founded, but is without merit.

The testimony of the witnesses for the common-

wealth showed abundantly that Stringer at the time he was cut was walking away from the defendant; that the defendant came up to his back, placed his arms around him and stabbed him in the right side until he fell to the ground; then grabbed hold of his head and pushed it up and down against the street a couple of times and then stabbed him until the blood was seen to flow some distance up from the wound. Such testimony as detailed by these witnesses fully sustains the verdict.

It is insisted further that the court erred in admitting the following questions and answers over the objection of the defendant to go to the jury:

"Q. Have you ever been convicted of a felony? A. Yes sir.

"Q. Where?   A. Akron, Ohio.

"Q. What were you convicted for?   A. Shooting a fellow.

"Q. Did you kill him?   A. Yes sir.

"Q. What was your punishment?   A. Second degree murder.

"Q. What was your sentence?   A. Ten years to life.

"Q. Did you serve that sentence? A. Yes sir."

The above questions were propounded to the defendant upon cross-examination.

In the case of Hannah v. Com., 220 Ky. 368, 295 S. W. 159, on the trial of Hannah for murder, practically the same questions were asked Hannah upon cross-examination over his objection, as in the instant case. In that case we said (page 160):

"While the form of the question was possibly objectionable, it is expressly provided in section 597, Civil Code, that the evidence of a witness may be impeached by his admission that he has been convicted of a felony, or by the record showing such a judgment. It is regarded as sufficient generally, for the purposes of such impeachment, to show the bare fact that he has been convicted of a felony; but inasmuch as the Code provision authorizes the proving of this fact either by the witness on cross-examination, or by producing the record, it was not prejudicial to also require the witness to show the length of the term of his punishment, as the judg-

ment, if produced, would have disclosed the same fact."

After the above questions were asked and answered by the defendant in the instant case, the court admonished the jury as follows:

"The jury will consider the evidence of the defendant that he has been convicted of a felony only in so far as it may affect his credibility as a witness, if it does so, and for no other purpose. It neither proves nor disproves his guilt or innocence on this charge."

The court did not err in permitting that testimony to be heard by the jury. We have held in a number of cases that the commonwealth on cross-examining a defendant had a right to ask in substance the questions complained of. Morgan v. Commonwealth, 72 S. W. 1098, 24 Ky. Law Rep. 2117; Bond v. Commonwealth, 236 Ky. 472, 33 S. W. (2d) 320; Carmichael v. Com., 263 Ky. 830, 94 S. W. (2d) 3; Hannah v. Commonwealth, supra.

Further complaint is made that the court erred in refusing to permit the defendant to answer when asked this question: "When you left there, you didn't leave for the purpose of avoiding arrest, did you?" The court was right in sustaining the objection to that question. In the first place, it was a leading question. The question, itself, suggested the answer, and for that reason it was incompetent, and, again, there was no avowal as to what the witness would state. Therefore, there is no merit in that. Catron v. Com., 251 Ky. 786, 66 S. W. (2d) 17; Burton v. Com., 254 Ky. 66, 70 S. W. (2d) 981.

The chief ground for reversal relied upon by defendant is, that the court committed an error in refusing to continue the case to another day in the term of court in which he was indicted. The record shows that the defendant was indicted on the 21st day of September, 1937, the second day of the term of court. His trial was set without objection on September 30th of the same term of court. At that time, he being unable to employ counsel, the court appointed two thoroughly qualified attorneys to defend him. A motion was made for continuance by the defendant and his counsel, when the case was called for trial, accompanied by an affida-

vit of counsel. By that affidavit they claimed that on account of other business they were unable to get time to consult the witnesses for the commonwealth or to confer with their client; that there were two witnesses whose identification were not known, whose testimony would be material, if they could locate them. The names of the witnesses were not given in the affidavit, nor was it stated what the defendant expected to prove by them if present. The grounds for continuance were a mere speculation on the part of the defendant and his attorneys.

The two reputable attorneys appointed by the court, as aforesaid, from the manner in which they handled the defense of Hunt, manifested their great skill and ability in managing the defendant's case.

The witnesses to the killing were few and lived near the place of the tragedy. The proof is to the effect that the meeting between the defendant and the deceased was by accident. The defendant stated that he did not know the deceased, had never seen him before that day. The trouble occurred exclusively because of a controversy over the pistol that the defendant had with him, and because the deceased, as he said, refused to return it to him. There were no special complications in the case Little time was necessary or should have been required in the preparation of the defense. From the record, we are convinced, there was nothing left undone in making the defense for the defendant.

We are cognizant that the court has often granted new trials in many cases where persons charged with crime, however guilty they may be, or whatever the nature of the crime, where the defendant's substantial rights have been prejudiced. In the case of McDaniel v Commonwealth, 181 Ky. 766, 205 S. W. 915, in quoting from Penman v. Commonwealth, 141 Ky. 660, 133 S. W. 540, we said (page 920):

> "Every person accused of crime, however guilty he may be, or whatever the nature of the crime charged against him, is entitled to a fair opportunity to prepare and present his defense. It is not the purpose of the law to deny any person accused of crime of the high privilege of establishing his innocence. And whenever it has appeared to this court that the accused was deprived of a reasonable opportunity to explain away his guilt or was

forced into trial without reasonable opportunity for preparation, we have not failed to grant a new trial. Because, however desirable in the interest of justice a speedy trial may be, it is of much greater importance that the law of the land should be administered in an orderly and deliberate way, so that every person arraigned for crime may have in truth a fair trial.''

In the McDaniel Case, supra, in quoting from Samuels v. Com., 154 Ky. 758, 159 S. W. 575, we said:

''We recognize that it is important in the administration of the criminal law that a trial may be had as speedily after the transaction under investigation as a decent regard for the rights of the accused will permit; but it is more important that the trial should be fair than that it should be speedy. The peace and order of society demand that persons charged with crime should be brought to an early trial and, if guilty, convicted and punished; but, while this is so, the right of the accused to reasonable time and opportunity to prepare and present his defense and establish his innocence, if he can, should not be lost sight of, or the trial conducted in such haste as to deny the accused the right to be heard in his own behalf.''

In the instant case, we are unable to reach the conclusion that the facts and circumstances developed by the evidence would necessitate much time in the preparation of the defense. It would have required but little time for the attorneys to have conferred with their client. All of the witnesses were in and around Somerset, easily to be reached. The court gave nine days in the preparation of the case. That was long enough for these attorneys to prepare the case, and after viewing the record, and seeing the way the defense was managed, the defense being a plea of self defense, we are unable to see any merit in that contention.

It is contended that the court committed an error in refusing the continuance of the case based upon the affidavit of the defendant which he filed. His affidavit is very short. We will, therefore, embody it in our opinion:

''The affiant, Gifford Hunt, states that the absent witness Bill Wallen, if present, would state, and that said statement would be true, as follows:

"That on the evening of the occurrence in question that he saw the defendant, Gifford Hunt, and the deceased, Joe Stringer, at his place on Highway No. 27, south of Somerset. He further states that if said Wallen was present he would state that he saw some one in the car with Stringer and Hunt strike the said Hunt with a tire tool."

It will be noted that the affidavit fails entirely to meet the requirement of Section 189, Criminal Code of Practice, as construed by this court. The law requires an affidavit for a continuance to embody certain specific statements, viz.: The affidavit must show the absence of the witness; must state the facts relied upon that would be testified to by the absent witness, and that the facts are material; must state that he was absent without the defendant's consent or procurement; that the purported testimony was true or that the defendant from his knowledge or belief, believed that it was true, and must show what steps were taken to procure the attendance of the witness, and that the witness was in the jurisdiction of the court, and that the defendant believes that the facts stated in the affidavit can be proven by the witnesses and when proven will be true. The defendant's affidavit fails to meet those requirements. Benge v. Com., 92 Ky. 1, 17 S. W. 146, 13 Ky. Law Rep. 308; Rogers v. Com., 188 Ky. 817, 224 S. W. 348; Fowler v. Com., 260 Ky. 433, 86 S. W. (2d) 148; Belcher v. Com., 216 Ky. 126, 287 S. W. 550; Tillman v. Com., 263 Ky. 488, 92 S. W. (2d) 755; Section 315, Civil Code of Practice.

The defendant further insists that the verdict of the jury which ended with the phrase "without pardon," was a prejudicial error; that those words indicated prejudice and bias upon the part of the jury. Such a phrase was only surplusage. It possibly indicated the very opposite of the contention of the defendant. The jury may have believed that the death penalty should have been inflicted, but to be merciful, they rendered a verdict for life, with the expression added to the verdict, "without pardon."

From the whole case, we find no cause to conclude that the substantial rights of the defendant have been prejudiced, but on the other hand, we think he obtained a fair and impartial trial.

Wherefore, the judgment is affirmed.