RENDERED:  JUNE 20, 2025; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2024-CA-0190-MR

LEXINGTON COAL COMPANY, LLC                                    APPELLANT

v.
APPEAL FROM FRANKLIN CIRCUIT COURT
HONORABLE THOMAS D. WINGATE, JUDGE
ACTION NO. 23-CI-00604

COMMONWEALTH OF KENTUCKY,
ENERGY AND ENVIRONMENT
CABINET                                                              APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  ACREE, CALDWELL, AND LAMBERT, JUDGES.

ACREE, JUDGE:  Lexington Coal Company (LCC) appeals the Franklin Circuit Court's determination that the Energy and Environment Cabinet (Cabinet) properly designated it as an "A3 Controller" of mining Permit No. 880-5194 resulting in its responsibility for emergency circumstances associated with the permit.  We affirm.

# BACKGROUND

In June 2023, the Cabinet filed an original action in circuit court seeking to restrain LCC and Revelation Energy (Revelation) from committing alleged violations of KRS[1] Chapter 350. The Cabinet alleged LCC and Revelation were "allow[ing] methane gas originating from [an] abandoned underground mine working on Permit No. 880-5194 to vent through water wells" located on the property of private individuals "creating an explosive situation." (Record (R.) 2.) The Cabinet additionally alleged LCC and Revelation were "allowing mining activities to adversely impact the water supply" of the same private individuals, leaving them "without any reliable source of potable water." (R. 2.)

LCC disputed the Cabinet's designation of LCC as an "A3 Controller," *i.e.*, a party responsible for conditions at the mine associated with Permit No. 880-5194, and moved to dismiss. (R. 131.) The motion was denied. LCC's 2017 Asset Purchase Agreement (APA) with Revelation and its affiliated entity, Blackjewel, LLC, (hereafter Blackjewel and, together with Revelation, Seller), primarily determines whether LCC is an "A3 Controller."

Pursuant to the APA, LCC acquired Seller's tangible and intangible assets, including sixty-one (61) mining permits, among which is the permit at issue. (R. 18, 39.) The assets did not constitute the entire subject matter of the

---

[1] Kentucky Revised Statutes.

-2-

contract. Beyond them, the APA defines as part of the subject matter Seller's "Obligations."

The APA is clear that LCC assumed some of Obligations and Seller retained others. Because this appeal turns on whether LCC assumed the specific obligation for which the Cabinet seeks to make LCC responsible, we start with the APA's definition of "Obligations."

> 1.1 <u>Definitions</u>. Unless otherwise provided to the contrary in this Agreement, capitalized terms[2] in this Agreement shall have the following meanings:
>
> . . . .
>
> "***Obligations***" means duties, liabilities and obligations, whether vested, absolute or contingent, known or unknown, asserted or unasserted, accrued or unaccrued, liquidated or unliquidated, due or to become due, and whether contractual, statutory or otherwise.

(R. 15, APA § 1.1.)

In subsequent sections, the APA clearly sets out what LCC assumed and what it did not. The relevant provisions are as follows:

> 2.2 <u>Assumed Obligations</u>. At Closing,[3] [LCC] will assume only the following obligations of Seller (collectively, the "***Assumed Obligations***"):

---

[2] Some "capitalized terms" in the APA are neither italicized nor bolded, and some are defined elsewhere than the Definitions section, 1.1. These distinctions do not affect our understanding and interpretation of the capitalized terms.

[3] The APA defines Closing as occurring not later than March 31, 2018. (R. 19.)

(a) All asset retirement liabilities and all other reclamation Obligations relating to the Purchased Assets whether arising before, on or after the Closing Date, but not including any asset retirement liabilities or other reclamation Obligations that are related to the Retained Obligations (as defined below) or any fines, penalties or similar charges arising before the Closing Date.

(b) All Obligations relating to the Purchased Assets arising from or related to Seller's purported ownership, possession, use or operation of the Purchased Assets after the Closing Date.

(c) The post-Closing obligations of Seller under the Purchased Assets that, by their terms, arise after the Closing Date, and are to be observed, paid, performed or discharged, as the case may be, at any time after the Closing date.

(d) All Obligations arising under any Environmental Law relating to the Purchased Assets arising at any time after the Closing Date.

2.3 Retained Obligations. Except for the Assumed Obligations, [LCC] shall not assume, and Seller shall remain solely responsible for and shall retain, pay, perform and discharge any and all other obligations of Seller (collectively, the "***Retained Obligations***").

2.4 Additional Consideration. As further consideration for [LCC's] assumption of the Assumed Obligations, Blackjewel shall pay [LCC] the sum of One Million Eighty-Six Thousand Dollars ($1,086,000) in Cash at Closing (the "***Cash Payment***").

(R. 18, APA, §§ 2.2-2.4.)

The factor that distinguishes the obligations LCC assumed from those Seller retained requires an understanding of the capitalized term, "Purchased Assets." LCC assumed Obligations "relating to the Purchased Assets" under section 2.2(a)–(d). Seller remained responsible for "any and all other obligations" – those not relating to the Purchased Assets. None of those other obligations are at issue.

"Purchased Assets" are defined in the APA's section 2.1. It includes equipment, inventory, contracts, and "Other Purchased Assets" specifically identified in separate schedules appended to the APA. (R. 17-18, APA § 2.1(a)-(f); 30-43, APA, Schedules 2.1(a)-2.1(f).) Critical to this appellate review, Purchased Assets include 185 real property leases to mine coal, (R. 31-37, APA, Schedule 2.1(b)), and the 61 mining permits referenced earlier. (R. 38-40, APA, Schedule 2.1(c).)

Contemporaneously with the APA, LCC and Seller executed a Permit Transfer Agreement (PTA). In the PTA, LCC specifically agreed to "assume and become liable for any and all liabilities arising out of the use or ownership of the Permits, but not including any fines, penalties, or similar charges *arising before the Closing Date*."[4] (R. 503, PTA § 2) (emphasis added). The PTA incorporated the APA into its own terms, (R. 505-06, PTA § 14), including Seller's representation

---

[4] The Closing Date was not later than March 31, 2018. (R. 19, APA § 2.5.)

that the Permits were in full force and effect and that there were "no outstanding penalties, notices of noncompliance, . . . or administrative actions or proceedings affecting the Permits." (R. 21, APA § 3.2(j).)

Importantly, because LCC was "attempting to achieve the status of 'successor in interest permittee'[,]" the PTA authorized LCC to commence operations prior to "the transfer to [LCC] of 'permittee liability' under the Permits." (R. 504, PTA § 5.) The PTA also provided:

> If any notice of violation, non-compliance or similar occurrence is issued with respect to [LCC]'s operations under the Permits after the Closing Date but prior to the transfer of such Permit, [LCC] shall have the duty to defend such violation, non-compliance or similar occurrence and, if applicable, to pay all fines associated therewith, to correct such violation, non-compliance or similar occurrence, and to perform all abative measures required by any Governmental Authority.

(R. 504, PTA § 6.)

The permit at issue was never transferred, and the parties are now embroiled in federal bankruptcy proceedings, as well as proceedings in various other forums. Nonetheless, looking to the APA and sections 5 and 6 of the PTA authorizing LCC's dominion over the permitted property, the circuit court upheld the Cabinet's designation of LCC as an "A3 Controller" and held it "liable as a responsible party for the ongoing emergency circumstances associated with" Permit No. 880-5194. (R. 802.) This appeal follows.

-6-

**STANDARD OF REVIEW AND DEFERENCE AFFORDED AGENCY INTERPRETATION OF STATUTES AND REGULATION**

We review questions of law *de novo*. *Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 475 (Ky. 2006). Interpretations of contracts and statutes are questions of law. *Adamson v. Adamson*, 635 S.W.3d 72, 77 (Ky. 2021).

Interpretations of regulations, too, present questions purely of law. Until recently, appellate courts deferred "to an administrative agency's interpretation of the statutes and regulations it is charged with implementing." *Huxol v. Daviess Cnty. Fiscal Court*, 507 S.W.3d 574, 578 (Ky. App. 2016). However, three factors affect our application of this erstwhile policy of deference.

First, courts apply the policy only to an agency's final order entered after a party is afforded due process pursuant to the agency's exercise of its quasi-judicial authority, such as the authority found in 400 KAR[5] 1:090, the Cabinet's administrative hearings practice provisions.[6] A circuit court's authority to review such administrative orders derives from KRS 23A.010(4) empowering circuit

---

[5] Kentucky Administrative Regulations.

[6] The diverse statutory authority for quasi-judicial Cabinet hearings under 400 KAR 1:090 is found in the following state and federal statutes and federal regulations: KRS 146.270, 146.450, 146.990, 149.344, 149.346, 151.125, 151.182, 151.184, 151.186, 151.297, 223.200, 223.991, 224.10-100, 224.10-410, 224.10-420, 224.10-430, 224.10-440, 224.40-310, 224.60-120, 350.020, 350.028, 350.029, 350.0301, 350.0305, 350.240, 350.255, 350.300, 350.465, 350.610, 351.315, 351.345, 351.350, 353.700, 30 Code of Federal Regulations (C.F.R.) Parts 724, 730, 731, 732, 733, 735, 917, 30 United States Code (U.S.C.) § 1253, 1255.

courts "to review the actions or decisions of administrative agencies[.]"[7]  In such cases, "[t]he court seeks not to form its own judgment, but, with due deference, to ensure that the agency's judgment comports with the legal restrictions applicable to it." *Smith v. O'Dea*, 939 S.W.2d 353, 355 (Ky. App. 1997).

The circuit court did not hear this case as an administrative appeal, but as an original action pursuant to KRS 23A.010(1) which grants it "original jurisdiction of all justiciable causes . . . ."  In original actions the circuit court *must* "form its own judgment" as to applicable law because such parties as LCC "have the right to believe, that the courts, having as they do the whole power of the commonwealth behind them, can and will in decency and order dispense justice *without* fear or *favor* . . . ." *McDaniel v. Commonwealth*, 205 S.W. 915, 919 (Ky. 1918) (emphasis added).  In original actions, the judicial branch cannot favor one party over the other simply because, as an executive branch agency, it too has the whole power of government behind it.  Judicial deference in an original action involving an administrative agency would unjustly favor one party over another.

The second factor in the erosion of the deference policy is the persuasive reasoning underlying the rejection of its federal counterpart, "*Chevron*

---

[7] In its entirety, KRS 23A.010(4) says:  "The Circuit Court may be authorized by law to review the actions or decisions of administrative agencies, special districts or boards.  Such review shall not constitute an appeal but an original action."  However, such reviews, "[w]hile technically original actions, . . . share many of the aspects of appeals. They invoke the circuit court's authority to act as a court of review." *Smith v. O'Dea*, 939 S.W.2d 353, 355 (Ky. App. 1997).

deference."[8] As Justice Thompson recently noted, "while the United States Supreme Court experimented with deferring to administrative agencies with the adoption of the *Chevron* doctrine in 1984, . . . it has unequivocally rejected this practice as being inappropriate with the requirement that Courts are tasked to determine the law." *Hall v. BPM Lumber, LLC*, 706 S.W.3d 191, 206 (Ky. 2024) (Thompson, J., dissenting) (citing *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).

The third factor, the *coup de grâce* of Kentucky's policy of judicial deference to agency interpretation of statutes and regulations, is Senate Bill 84. 2025 Ky. Acts ch. 112 (SB 84) ("An Act relating to judicial review of state agency action."). Effective June 27, 2025, judicial deference to agency interpretations of statutes and regulations is prohibited. *Id.*

The circuit court deferred to the Cabinet's interpretation of the relevant statutes and regulations but should not have. (R. 798, Order.) However, because this Court undertakes a *de novo* review and reaches the same conclusion, any error by the circuit court's deference is harmless.

## ANALYSIS

The circuit court founded its conclusion that LCC was an "A3 Controller" on 405 KAR 8:001 § 1(76)(a)3., which says:

---

[8] *Chevron, USA, Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837 (1984).

"Owned or controlled" and "owns or controls" mean any one (1) or a combination of the relationships established in paragraphs (a) and (b) of this subsection.

(a) . . . .

3. Having any other relationship that gives one (1) person authority directly or indirectly to determine the manner in which an applicant, an operator, or other entity conducts surface coal mining operations . . . .

405 KAR 8:001 § 1(76)(a)3. Interpreting the APA and PTA in this context, the circuit court concluded LCC was an "A3 Controller" of the permit. We agree.

The circuit court might also have looked to 405 KAR 8:001 § 1(76)(b)5. which says "instruments of ownership," such as the APA and PTA, raise a presumption of "ownership or control." Without specifically referencing this subsection of the regulation, the circuit court correctly focused on these instruments in determining whether the Cabinet's designation was correct, and LCC fails to rebut the presumption.

In fact, LCC concedes the executed APA and PTA made it an "A3 Controller" of the permit at issue but contends such status ceased in 2019 when interim Revelation CEO David Beckman, by letter, "revoked LCC authority relating to the Permit." (Appellant's Br. 6.) The existence of Beckman's communication is not contested. The question then is whether, as a matter of law, that communication ended the obligations LCC explicitly assumed.

-10-

There are several problems with LCC's reliance on Beckman's letter to support its argument, not the least of which is that it is not written to LCC or its representatives and does not mention LCC. But, for purposes of review, we can presume whatever effect the letter's author intended was directed to the proper entity. That leaves only a legal question – does the letter have the effect of reversing LCC's express assumption of obligations associated with the subject permit? We conclude, as a matter of law, that it does not.

Beckman's letter says, "[W]e are not aware of any authority granted to [LCC[9]] that would enable [LCC] to conduct operations of Blackjewel, L.L.C., Blackjewel Holdings L.L.C. or Revelation Energy, LLC." (R. 184.) Beckman's failure to comprehend such authority notwithstanding, this Court is now charged with determining whether such authority, in fact, does exist. We conclude, as set forth in the Background section above, that the clear language of the PTA expressly authorized LCC to "commenc[e] operations upon the property encompassed by the Permits before the transfer to [LCC] of 'permittee liability' under the Permits." (R. 504, PTA § 5.) It existed from the time both parties executed the APA and PTA.

---

[9] In accordance with our presumption that they are one and the same, we substitute "LCC" for the entities the letter actually identifies, "Jeffrey Hoops, or his entities, affiliates or employees (collectively, Hoops Persons')[.]"

-11-

Beckman's letter further states, "To the extent [LCC] has been granted such authority in the past, such authority should be deemed to have been (and is hereby) revoked." This presents a pure question of law – did the law or any provision of the APA or PTA authorize Beckman to revoke the authority Seller granted LCC to conduct operations on the leased and permitted property after these bilateral contracts were executed in 2017? We answer that in the negative.

Divination is not among the powers of this Court, and this is why briefing is so crucial to our understanding of a given case. LCC does not direct us to any provision in either agreement allowing Seller (Revelation or Blackjewel) to unilaterally "revoke" any authority the agreements conferred upon LCC, or which otherwise triggers reversion of the obligations LCC assumed in executing the agreements. LCC contends "[t]here is no question" Seller was authorized to revoke LCC's contract right. We too find there is no question, that it was not.

LCC informs the Court of various proceedings in other forums, such as federal bankruptcy court, without explaining how these proceedings invalidate the agreements. Absent a persuasive argument to the contrary, we conclude the APA and PTA continue to determine LCC's obligations despite such proceedings. Because LCC conceded the agreements made it an "A3 Controller" until 2019, and because we conclude Beckman's letter had no legal effect on the agreements' operations, it follows that LCC remains an "A3 Controller" of the permit at issue.

-12-

LCC also argues the circuit court's determination of its status as an "A3 Controller" of the permit was an inappropriate and premature grant of summary judgment. But these arguments are without merit. Again, LCC concedes the APA and PTA made it an "A3 Controller" of the permit, and the circuit court concluded the APA and PTA were valid contracts. (R. 800-01.) The circuit court specifically observed "[t]he bankruptcy action did not void" the APA and PTA. (R. 800.) LCC does not challenge these conclusions on appeal. We again run headlong into the question hanging over LCC's entire appeal: why should we perceive the agreements to be rendered inoperable? Even if LCC has properly characterized the circuit court's determination as a grant of summary judgment, given LCC's concession and the circuit court's unchallenged conclusions the agreements are valid and have not been voided, there is no genuine issue of any material fact precluding a determination the agreements make LCC an "A3 Controller" of the permit at issue.

Finally, LCC argues that even if it is an "A3 Controller" of the permit at issue, "There is no independent obligation to conduct reclamation work or pay penalties by an owner or controller on a permit." (Appellant's Br. 12.) Its argument is that the only purpose for the "ownership and control obligation" determination is to make the "person or entity linked to such a site" that needs to

be reclaimed "ineligible to obtain additional permits from Kentucky or any other state." (*Id.*)  LCC sets up a straw-man argument.

LCC claims that "[d]uring implementation of the [federal] ownership and control rules, several commentators" were concerned that the rule, by its operation alone, would "subject[] a new class of person to liability for civil penalties and reclamation work . . . ." (*Id.* at 13.)  LCC quotes the response of the Interior Department's Office of Surface Mining Reclamation and Enforcement (OSMRE) as supporting its argument it has no successor liability.  The OSMRE said, "*The rule* does not transfer liability for civil penalties and reclamation work to the permit applicant [or, we presume LCC would include the permit transferee]. Those responsibilities remain with the persons who originally incurred the obligation."  Requirements for Surface Coal Mining and Reclamation Permit Approval; Ownership and Control, 53 Fed. Reg. 38868-01, 38875, 1988 WL 254642 (F.R.) (Oct. 3, 1988) (emphasis added).  However, OSMRE's response does not suggest the rule operates to insulate parties from responsibility if they assume such obligations by means of contracting it.  Quite the contrary.

LCC fails to alert the Court to a subsequent part of OSMRE's comments, just a page later, where successor liability is expressly addressed.  That part, entitled "Successor Responsibility," says:

> When a company acquires only assets of an entity, its responsibilities will depend upon a number of factors.

For instance, . . . assets may be transferred without transferring responsibility for violations. However in these instances the contract of sale or other legal instrument must clearly establish that responsibility remains with the selling entity.

The law of successor liability is complex. Although the general rule is that where a corporation sells all its assets to another company, the buyer is not liable for the obligations of the seller, significant exceptions exist. As one Federal Court stated:

> Four exceptions to the general rule of nonliability are widely recognized * * * . Thus, *where (1) the purchaser of assets expressly or impliedly agrees to assume obligations of the transferror*; (2) the transaction amounts to a consolidation or de facto merger; (3) the purchasing corporation is merely a continuation of the transferror corporation; or (4) the transaction is fraudulently entered into to escape liability, a successor corporation may be held responsible for the debts and liabilities of its predecessor. . . . A fifth circumstance, sometimes included as an exception to the general rule, is where the transfer was without adequate consideration and provisions were not made for creditors of the transferror. . . .
>
> *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 309 (3d Cir. 1985). . . . Each of these exceptions may be applicable, alone or in combination, to possible ownership or control relationships where *a successor may be held responsible under the Act*.

1988 WL 254642 (emphasis added). The APA and PTA establish that LCC's

liability for the penalties and reclamation the Cabinet seeks to impose is justified

-15-

because LCC expressly agreed to assume the obligations of the permit transferor, Revelation and Blackjewel.

LCC is correct that KRS 350.028(5) directs that the Cabinet's regulations "shall be no more stringent" than the Surface Mining Control and Reclamation Act of 1977 (SMCR) (30 U.S.C § 1201 *et seq.*). However, the SMCR allows to the states discretion regarding reclamation operations, from development to enforcement. 30 U.S.C. § 1201(f) ("[T]he primary governmental responsibility for developing, authorizing, issuing, and enforcing regulations for surface mining and reclamation operations subject to this chapter should rest with the States.").

We are unpersuaded by LCC's arguments that the circuit court erred in finding LCC was an A(3) owner or controller of the permit in question and that LCC was obligated to perform reclamation work relating to that permit.

### CONCLUSION

The Franklin Circuit Court's October 13, 2023 order is affirmed.


LAMBERT, JUDGE, CONCURS.

CALDWELL, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:

Billy Shelton
Lexington, Kentucky

BRIEF FOR APPELLEE:

Emily S. Payne
Blake E. Adams
Frankfort, Kentucky